REILLY INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reilly Indus. v. Commissioner
Docket No. 12724-93
United States Tax Court
T.C. Memo 1995-340; 1995 Tax Ct. Memo LEXIS 340; 70 T.C.M. (CCH) 185; July 26, 1995, Filed *340 Decision will be entered under Rule 155. For petitioner : Larry J. Stroble and Michael R. Fruehwald. For respondent: Ronald T. Jordan. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the taxable years 1977 and 1979 in the amounts of $ 65,531 and $ 438,128, respectively. After concessions, the sole issue remaining for decision is whether petitioner realized a foreign currency exchange gain in 1979 in the amount of $ 392,707, arising from the repayment to it of a loan previously made to its Belgian subsidiary. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Although officers of petitioner testified at trial about petitioner's intent, most of the material facts have been stipulated. The stipulated facts are incorporated in our findings by this reference. Petitioner is an Indiana corporation with its principal place of business in Indianapolis, Indiana, at the time the petition was filed. Petitioner is in the business of manufacturing industrial chemicals, including a chemical known as pyridine. In the early 1970's, *341 Imperial Chemical Industries (ICI), a British corporation, was the primary customer for petitioner's pyridine. The manufacturing facilities of ICI were located in Great Britain. ICI was obligated, under a "take or pay" supply contract with petitioner, to purchase specified quantities of the pyridine that petitioner manufactured. ICI opened a manufacturing facility in the State of Texas in the early 1970's. After this facility was opened, petitioner sent the majority of the pyridine that it manufactured to the ICI Texas facility, rather than to its British manufacturing plants. Consequently, the ICI British facilities required another source for the pyridine. Petitioner decided, based principally on the need of ICI for an additional source of pyridine, to locate a manufacturing facility in the Kingdom of Belgium. On October 15, 1973, petitioner wrote a letter to the State Secretary for Regional Economy of Belgium, setting forth petitioner's proposal to locate a manufacturing facility in Belgium. In the letter, Thomas E. Reilly, Sr. (Reilly, Sr.), requested grants from Belgium, including interest subsidies, cash grants, real property tax abatement, and accelerated depreciation on *342 capital assets, as well as abatement of the registration tax on capital stock. The Ministry of Regional Economy of Belgium approved petitioner's requests for the subsidies and other benefits. In order to maximize the subsidies provided by the Belgium Government, petitioner was required to fund 50 percent of the total estimated cost for the construction of the manufacturing facility from sources outside of Belgium. The remaining 50 percent of the estimated cost could be financed from sources within Belgium. Petitioner formed a subsidiary named Reilly Chemicals, S.A. (RCSA), to own and operate the new manufacturing facility. RCSA was incorporated under the laws of Belgium in March 1974. Petitioner planned to construct the Belgium manufacturing facility in two phases -- the first beginning in 1974 with completion in 1975 and the second beginning in 1975 with completion in 1977. The total cost for construction of the first phase was estimated to be BF (Belgian franc) 290 million. From 1975 to 1979, petitioner's board of directors consisted of the following persons: Peter C. Reilly, Jr. (P. Reilly); Thomas E. Reilly, Jr. (T. Reilly); Thomas J. Ryan (Ryan); Rolla E. McAdams (McAdams); *343 and Reilly, Sr. From January 1, 1975, to May 9, 1976, P. Reilly served as chairman; Reilly, Sr., served as president; T. Reilly served as vice president; and McAdams served as secretary and assistant treasurer. The RCSA board of directors, from 1974 to 1979, consisted of the following persons: P. Reilly, T. Reilly, Ryan, McAdams, and Peter J. Cislak. T. Reilly served as president of RCSA during this period and functioned as the principal project manager in the development of the business of RCSA. McAdams was assigned primary responsibility for financing matters related to the construction of the manufacturing facility and to the start-up of RCSA. In 1974 and the first part of 1975, petitioner used its own funds to satisfy the requirement for its investment in RCSA. Funds were provided in the form of U.S. dollars either by transferring such amounts to the RCSA bank account at the Banque de Bruxelles Lambert in Belgium or by paying bills on behalf of RCSA. Petitioner established a general ledger account, designated as account No. 147 (account 147), to record its investment in RCSA. The account was debited for amounts that petitioner transferred to RCSA in cash, as well as for advances *344 of products and machinery and for the payment of expenses on behalf of RCSA. The account included amounts that were classified by petitioner as an investment in the capital stock of RCSA as well as amounts that were classified as loans. Petitioner maintained account 147 on a U.S. dollar basis and did not make any adjustment to the dollar-denominated balances in the account to reflect fluctuations in the U.S. dollar/Belgian franc exchange rate. As of December 31, 1974, the total balance in the account was $ 890,073.27, resulting from an initial cash transfer to RCSA of $ 295,805.50 and from the payment by petitioner of several expenses of RCSA in the amount of $ 594,267.77. In September 1975, T. Reilly wrote a letter to the Belgium Government reporting that RCSA intended to build an expansion of its plant, increasing the total investment from BF 290 million to BF 660 million. In order to secure funds for additional advances to RCSA, petitioner applied to the Continental Illinois National Bank & Trust Company located in Chicago, Illinois (Continental Bank), to acquire BF 165 million. Continental Bank approved a loan of BF 165 million to petitioner. In November 1975, petitioner and *345 Continental Bank, S.A. (CBSA), a Belgian subsidiary of Continental Bank, entered into a Belgian Franc Term Loan Agreement (the Continental Bank loan) providing for the loan of BF 165 million to petitioner. The agreement provided that the loan was to be repaid by petitioner in Belgian francs in seven semiannual installments, beginning on the second anniversary of the third advance under the agreement. The Continental Bank loan was made to petitioner in three separate advances. The first advance was made on November 27, 1975, in the amount of BF 70 million. That advance was deposited into petitioner's account at CBSA and then transferred directly to the account of RCSA at the Banque de Bruxelles Lambert. Subsequent advances on the loan in the amounts of BF 45 million and BF 50 million were made in an identical manner on January 2, 1976, and February 27, 1976, respectively. When petitioner transferred these three amounts to the RCSA account, it recorded the intercompany advances on its books in U.S. dollars by debiting account 147 in the respective amounts of $ 1,750,000, $ 1,125,000, and $ 1,250,000, in accordance with the conversion rate of 40 BF's per U.S. dollar, the prevailing *346 exchange rate at the time of the transfers. In addition to the funds that it obtained from CBSA, petitioner made advances to RCSA in the form of U.S. dollars. Petitioner recorded these transfers by debiting account 147 on the basis of their dollar value. No distinction was made between funds provided by petitioner in the form of U.S. dollars and those amounts that had been obtained under the Continental Bank loan and provided to RCSA in the form of Belgian francs. Petitioner's investment in RCSA consisted in part of a capital stock investment, which it increased in amount from time to time to satisfy the conditions that the Belgium Government attached to its incentive grants. The balance of petitioner's investment in RCSA was treated as loan advances. Petitioner wished to charge RCSA interest with respect to the loan advances. To ensure the deductibility of the interest for purposes of Belgian tax laws, petitioner and RCSA were required to document the loan with a written agreement (RCSA loan agreement) providing for the payment of interest. The RCSA loan agreement was prepared to document the terms of the various loan advances previously made or to be made to RCSA by petitioner. *347 McAdams was primarily responsible for developing the terms of the RCSA loan agreement, although numerous other persons were involved in drafting its specific provisions. In planning the formation and financing of RCSA, petitioner was advised and assisted by the law firm of Baker & McKenzie, the accounting firm of Coopers & Lybrand, representatives of CBSA and the Banque de Bruxelles Lambert, and petitioner's own staff. Furthermore, the RCSA loan agreement, itself, was reviewed by petitioner's legal counsel, by representatives of Coopers & Lybrand, and by other officers of petitioner. The RCSA loan agreement required at least three revisions before it was finalized. An initial draft of the agreement provided for an interest rate of 10.5 percent per annum, computed semiannually. Upon the advice of Coopers & Lybrand in Brussels, petitioner revised the draft agreement to provide for an interest rate that was tied to the Belgian prime rate of interest. This was done to ensure that the RCSA interest payments to petitioner would be deductible under Belgian tax law. The RCSA loan agreement was executed in February 1976, although it was effective retroactive to January 1, 1975. The agreement *348 was signed on behalf of petitioner by Ryan, then president of petitioner, and on behalf of RCSA by T. Reilly, president of RCSA. In pertinent part, the RCSA loan agreement provided: 1. Advance(s), as the term is used in this Agreement, shall mean money provided by REILLY TAR to REILLY CHEMICALS under the terms and conditions of this Agreement. * * * 2. Commencing January 1, 1975, REILLY TAR agrees to make said advances to REILLY CHEMICALS as may be deemed proper and advisable for the purposes hereinabove set forth. The total sum of such advances shall not exceed 240,000,000 Belgium Francs, and no advances may be made under this Agreement after December 31, 1976. 3. REILLY CHEMICALS shall be charged interest by REILLY TAR on all outstanding advances. The annual rate of interest will be determined on the 1st of January of each year at the Belgian bank premium interest rate plus three points and the charge for interest will be computed annually by REILLY TAR. The payment of this interest will be made as provided in Article 5. 4. REILLY TAR accepts that payment of all interest is made by REILLY CHEMICALS net of Belgian withholding tax. 5. Re-payment of all advances made *349 hereunder, and all interest due thereon, shall be made by REILLY CHEMICALS no later than December 31, 1986. It is understood between the parties that, as of the date of this Agreement, re-payment shall not commence prior to January 1, 1982; provided, however, that REILLY CHEMICALS may, if it is able to do so, accelerate re-payment of said advances without penalty.
As of December 31, 1976, the RCSA loan agreement was amended to change the maximum amount of advances permitted under the agreement from BF 240 million to BF 400 million. The amendment was embodied in an agreement titled " Supplemental Agreement". All other terms and conditions of the original agreement remained unchanged. Petitioner considered the interest rate on the Continental Bank loan to be relatively high and wished to make prepayments of that loan when feasible. On December 29, 1976, petitioner prepaid BF 20 million of the BF 165 million that it owed to CBSA, under the Continental Bank loan. Petitioner acquired the BF 20 million in the open market. At the time of prepayment, the conversion rate for Belgian francs to U.S. dollars was BF 35.99 per U.S. dollar. Because the conversion rate on the date of the first *350 advance of the loan had been BF 40 per U.S. dollar, petitioner claimed on its 1976 Federal income tax return that it realized a $ 55,709 loss on the prepayment. On November 27, 1978, petitioner prepaid BF 100 million of the Continental Bank loan. Petitioner obtained the BF 100 million from a partial prepayment of the RCSA loan by RCSA. RCSA transferred BF 100 million from its account at CBSA to petitioner's nonresident account at CBSA. Petitioner's nonresident account at CBSA was then debited by the bank and credited against the loan balance of the Continental Bank loan. As a consequence of the BF 100 million transfer from the account of RCSA to petitioner's account at CBSA, petitioner credited account 147 in the amount of $ 3,295,000. This amount represented BF 100 million at the effective conversion rate on the date of the transfer of BF 32.95 per U.S. dollar. On February 27, 1979, petitioner paid the BF 45 million principal loan balance to CBSA. Again, petitioner arranged for RCSA to prepay a portion of the RCSA loan. On February 27, 1979, petitioner's nonresident account with CBSA was debited for BF 45 million (plus interest) in payment of the remaining balance on the Continental *351 Bank loan. That transaction temporarily created an overdraft, but the overdraft was covered on March 1, 1979, when RCSA transferred BF 45 million from its account at CBSA to petitioner's account at CBSA. As a result of the BF 45 million transfer from RCSA's account to petitioner's account, petitioner credited account 147 by the sum of $ 1,517,707, which equaled BF 45 million at a conversion rate of BF 29.65 per U.S. dollar. The credits petitioner made to account 147 in 1978 and 1979 when RCSA prepaid a portion of the RCSA loan in Belgian francs reduced the total amount that RCSA owed petitioner for all prior advances. These credits were not matched against any particular prior advance. Rather, the dollar value of these prepayments reduced the total amount of debt RCSA owed petitioner, as recorded in account 147. Based upon the prepayments of the Continental Bank loan in the amounts of BF 100 million and BF 45 million, petitioner reported exchange rate losses on its 1978 and 1979 Federal income tax returns in the amounts of $ 795,000 and $ 392,707, respectively, to reflect the decline in the BF per U.S. dollar conversion rate since the time the advances were made by CBSA. The exchange *352 rate at the time the advances were made was BF 40 per U.S. dollar. At the time the BF 100 million was repaid, the exchange rate was BF 32.95 per U.S. dollar, and, at the time the BF 45 million was repaid, the exchange rate was BF 29.65 per U.S. dollar. The financial results of RCSA were not consolidated with the financial statements of petitioner until 1978 because of the status of RCSA as a "start-up" corporation. In its books and records and in its audited financial statements for 1975, 1976, and 1977, RCSA recorded advances from petitioner as a Belgian franc liability. In February 1979, McAdams met with representatives of Coopers & Lybrand in Brussels to discuss, among other things, the draft by the firm of the RCSA financial statement for 1978 and the consolidation of financial statements for 1978 of petitioner and RCSA. McAdams advised the representatives that advances to RCSA that were covered by the RCSA loan agreement were intended to be measured by their U.S. dollar value based on the prevailing exchange rate on the dates the loans were made. This advice was confirmed by a letter from McAdams to Coopers & Lybrand dated March 19, 1979. Coopers & Lybrand then revised the financial *353 statements of RCSA to treat the loan as a U.S. dollar liability. On its Belgium tax returns for 1978 and 1979, RCSA reported foreign currency gains reflecting the difference between the exchange rate on the date of the advances and the exchange rate on the date of repayments. The interest accrued under the RCSA loan agreement as of December 31, 1979, was repaid in full on December 17, 1980. The amount was paid off in U.S. dollars, partly by means of a wire transfer to petitioner's account with Continental Bank in Chicago and partly by remittance to the Belgian tax authorities in payment of petitioner's liability for the applicable 15-percent Belgian withholding tax. The final principal balance owed by RCSA under the RCSA loan agreement was also paid off in U.S. dollars. OPINION The parties present their dispute to the Court as strictly a factual issue, i.e., as stated by respondent: "At issue is whether the loan petitioner made to its Belgian subsidiary, RCSA, was denominated in Belgian francs." They do not dispute the proposition that, if a U.S. taxpayer borrows foreign currency and satisfies the obligation in foreign currency, a gain or loss may result from changes in the exchange *354 rate. See, e.g., , and cases cited therein. Petitioner, in fact, on its return for 1979, claimed that it sustained a deductible foreign currency exchange loss on repayment of its liability to Continental Bank. Respondent's determination in the statutory notice and her argument in the trial memorandum, at trial, and on brief is that petitioner realized gain on repayment to it of its loan to RCSA. Only this argument has been pursued, although, prior to trial, respondent was allowed to amend her answer to allege that the loss deducted on petitioner's return should be disallowed because no economic loss was sustained by petitioner when petitioner directed RCSA to deliver Belgian francs to Continental Bank in partial satisfaction of the liability of petitioner to Continental Bank and the liability of RCSA to petitioner. Respondent has not pursued the alternative theory pleaded in the amendment to the answer and thus has abandoned it. It is agreed, therefore, that, if the RCSA loan was U.S. dollar-based, petitioner realized no foreign currency exchange gain upon the final partial repayment (BF 45 *355 million) of the loan by RCSA in Belgian francs in 1979, because petitioner simply received a repayment measured in U.S. dollars that was equal to what petitioner had loaned measured in U.S. dollars. If, on the other hand, a portion of the loan was denominated in Belgian francs, petitioner realized a foreign currency exchange gain on the partial repayment of this portion of the loan, because the payment by RCSA of the face amount of the loan measured in Belgian francs would have resulted in petitioner's receiving a greater amount measured in U.S. dollars than petitioner had loaned to RCSA. Respondent argues that the substance of the transaction between petitioner and RCSA establishes that the portion of the loans transacted in Belgian francs should be treated as denominated in Belgian francs. Respondent relies on the determination of interest by reference to the Belgian bank prime rate and respondent's view that "well accepted business practice required petitioner to hedge its currency risk on the loan from Continental Bank SA." Respondent concludes that it would have been unreasonable for petitioner to have loaned U.S. dollars to RCSA but to have charged RCSA a Belgian rate of interest *356 and that the RCSA loan would have served as a hedge for petitioner and, therefore, must have been denominated in Belgian francs. Petitioner argues, and we agree, that respondent's theories as to why the RCSA loan must have been denominated in Belgian francs are based upon respondent's view of sound business practice and are unsupported by any evidence in the record. The evidence does, to the contrary, reflect that the interest rate for the RCSA loan was tied to the Belgian prime rate to assure deductibility under Belgian tax law. Further, all interest on the loan, although calculated with reference to a Belgian interest rate, was paid by RCSA to petitioner in U.S. dollars. This case must be decided on the record and not on an inference of what petitioner should have done in accordance with respondent's view of sound business strategy and risk management. The denomination of the RCSA loan must be ascertained from the written loan agreement and the intention of the parties to that agreement, as shown by the stipulated facts and the testimony of McAdams and T. Reilly. The RCSA loan agreement was drafted to cover both U.S. dollar advances and Belgian franc advances from petitioner *357 to RCSA. In paragraph 1 of that document, the term "advances" is defined as "money provided by REILLY TAR to REILLY CHEMICALS under the terms and conditions of this Agreement." The next reference to advances is made in connection to the loan cap in paragraph 2, quoted in full in our findings, which provides that "The total sum of such advances shall not exceed 240,000,000 Belgian Francs". Respondent maintains that, by specifically defining the term "advances" as "money provided by REILLY TAR to REILLY CHEMICAL", the RCSA loan agreement "clearly" indicates that each advance made to RCSA was to be denominated in the currency that petitioner used to make the advance. Thus, to the extent that petitioner made advances of Belgian francs to RCSA, the term "advances" meant Belgian francs. Respondent further maintains that the type of currency provided as an advance to RCSA was the type of currency required to be repaid, because paragraph 5 of the agreement provides for "Re-payment of all advances made hereunder". RCSA repaid petitioner BF 100 million in 1978 and BF 45 million in 1979. Therefore, respondent concludes, the advances totaling BF 165 million made by petitioner to RCSA in 1975 *358 and 1976 were denominated in Belgian francs. Respondent maintains that petitioner's method of accounting for the loan and any evidence of petitioner's intention and understanding of how the loan was to be denominated are inadmissible under the so-called Danielson rule, articulated in , vacating and remanding . Alternatively, respondent contends that petitioner has the burden of presenting strong proof to alter the specific, unambiguous terms of the RCSA loan agreement. Petitioner argues that the RCSA loan agreement is silent with respect to the denomination of the debt. Therefore, in petitioner's view, the parties' understanding of how the obligation of RCSA was to be measured must be determined from external evidence. Petitioner contends that, even if an inference as to the denomination of the RCSA loan may be drawn from the agreement, the agreement is, at best, ambiguous, and its construction must be ascertained from evidence of the parties' intent and conduct in connection with the loan. Additionally, petitioner maintains that the Danielson rule *359 is not applicable here because this case is appealable to the Court of Appeals for the Seventh Circuit. See . Petitioner also argues that the strong proof rule is not appropriate because the RCSA loan agreement is ambiguous. Neither the Danielson rule nor the strong proof rule applies where neither party is attempting to vary the terms of the agreement but seeks only a construction of a clearly ambiguous document in a manner favorable to its position. ; . In these cases, the taxpayer bears the burden of proving that its interpretation of the written agreement at issue is correct by a mere preponderance of the evidence. , affd. USTC par. 9885 (10th Cir. 1984); , affd. . *360 We conclude here that the references to the term "advances" in the agreement are ambiguous. The loan agreement does not expressly state the currency denomination of the money to be used either to make advances or to repay them. Nor does it state that repayments shall be made in the same currency as advances being repaid. Although RCSA received advances in Belgian francs of 165 million, it made payments in Belgian francs of only 145 million. Respondent's interpretation would require that different meanings apply to the terms "advances" and "money". A contract term is ambiguous if it is susceptible of two reasonable interpretations. ; . We agree with petitioner that both U.S. dollars and Belgian francs are "money" within the meaning of paragraph 1 of the agreement. Thus, the term "advances" as used in the agreement is susceptible to interpretation as either U.S. dollar-denominated or BF-denominated. We may thus consider extrinsic evidence, such as the testimony of petitioner's executives, concerning *361 the construction placed upon the contract by the parties themselves, in determining the meaning of the agreement. Petitioner's other actions with respect to the agreement are also relevant to ascertaining the parties' intentions regarding the denomination of the advances at issue. See . Petitioner recorded all of the loan advances it made to RCSA by debiting account 147 on a U.S. dollar basis irrespective of whether the advances were made in U.S. dollars or Belgian francs. All repayments by RCSA to petitioner were also recorded by petitioner in account 147 on a U.S. dollar basis. In particular, in 1979, when RCSA made the partial repayment at issue using Belgian francs, which petitioner then used to repay a portion of its loan obligation from CBSA, petitioner credited account 147 in U.S. dollars, not Belgian francs. The testimony at trial confirms the reasons for the contemporaneous records of U.S. dollar-denominated transactions. Petitioner maintains that its consistent financial accounting treatment and tax treatment of the repayments demonstrate that the RCSA loan was to be denominated *362 in U.S. dollars. RCSA's treatment of the loans on its books conformed to this understanding beginning in 1978, and RCSA reported foreign currency gains on its Belgian tax returns for 1978 and 1979. In respondent's view, petitioner's reporting methodology for the RCSA loan merely represents an inadequate accounting practice and is not determinative of the substance of the loan transaction. Although the interest rate of the loan and maximum total loan were expressed in Belgian francs, the record demonstrates that petitioner had valid business reasons, apart from choosing the currency denomination for the loan, for these attributes of the loan. McAdams testified that the maximum total loan was expressed in Belgian francs in order to assure the Belgian authorities and the Bank de Bruxelles Lambert that petitioner would satisfy its commitment to fund 50 percent of the costs of the operations of RCSA. McAdams also testified that petitioner chose to tie the interest rate on the loan to the Belgian prime rate in order to insure that RCSA would be able to deduct its interest payments to petitioner under Belgian tax law. T. Reilly also testified that it was understood that the RCSA loan was *363 to be denominated in U.S. dollars because:
our shareholders are compensated in dollars. We were a U.S. company. We had no other foreign operations. And the money was going in there under all different sorts of manifestations at different periods of time, and it would have been very confusing to have accounts in various currencies, all kept in the U.S. So we decided to have one account and have it in dollars.
For tax reporting and financial accounting purposes, petitioner consistently treated the RCSA loan as denominated in U.S. dollars. Although RCSA treated the loan as a BF-denominated liability in its records until its financial statements were consolidated with those of petitioner in 1978, the evidence reflects that this inconsistent reporting represented an erroneous assumption on the part of RCSA's accountant. We have no basis for rejecting the testimony and contemporaneous documentation. The stipulated facts also support petitioner's position. Petitioner has established by a preponderance of the evidence that petitioner and RCSA intended for the loan to be based in U.S. dollars, not in Belgian francs. In sum, petitioner transferred Belgian francs to RCSA and treated *364 the value in U.S. dollars as an advance to RCSA. In 1979, petitioner received Belgian francs from RCSA having the same dollar value in satisfaction of the advance. Therefore, petitioner need not recognize a gain in 1979 on repayment to it of a portion of its advances to RCSA. Decision will be entered under Rule 155.